please the court. On behalf of Marcus Duane Slade and the Slade appellants, my name is William Huey and I'm here today to present to the court an area of concern with Slade family dealing with Marshall, Texas on a cold night. I am aware of the fact that the issues that I presented to the court on the two points that have been raised are actually asking this court to push the envelope as it relates to the concept of causation on one point, and I'm also asking this court to push the envelope as it deals with adopting the common law of the jurisdictional state where the cause of action has arisen. I think to give the court a good feel of what's going on, obviously you're aware that agents of the Marshall Police Department arrived at a location on the night of January 4th, 2013, where they found a nude black male by the name of Marcus Slade. Just like everything else that's been going on in America in reference to the aspect of videos being present, the events that I'm standing before you to discuss are captured by way and memorialized by way of videos. The primary issue that puts us here is whether or not Mr. Slade's constitutional right under 1983, considering with the receipt of medical care, was violated. The standards have been pretty clearly set by the Supreme Court in Farmer v. Brenham and also in this jurisdiction in Neuron v. Livingston Police Department. When I tended to the court to appreciate this case, I would like to extend to the case what these officers knew before they arrived at that scene. When I make reference as to what they knew, I make reference to the fact that each one of the officers were certified to use the TASER device. The record is clear that they received training utilizing the version 14 TASER training package, a videotape compressed with all types of documentation. So what did they know as certified TASER users when they arrived at that location? Counsel, let me ask one question. How old was this man? Marcus was about to have a birthday, and I think he would have been turning 32 on that birthday. A young man. Very young, Your Honor. When they arrived there, under tab 5 of our excerpt, we're comfortable with the fact that they should have known by way of a PowerPoint presentation put together under version 14 of the TASER training package that there was a specific section dealing with Southern Deaf Syndrome and In-Custody Deaf Syndrome. So they would have known that if they came in contact with, this is coming from the TASER training, an individual that was bizarre or violent behavior, Marcus Slade, an individual who was disrobing, Marcus Slade was nude, an individual who had super strength and endurance, which is reflected in reports and in the video, an individual who was impervious to pain. He laughed when he was tased. They would have known that they had come across an individual that TASER had informed them are individuals that are a high likelihood of death as a result of a TASER encounter. And additionally, what they would have come into, based on the excerpt that I provided under tab 5, they would have come in contact with what was called the Florida naked man walking down the street bizarre video. They would have come in contact with the fact that knowing that this individual was an individual based on the TASER training that you would consider activating EMS prior to coming in contact with him. They also would have been aware, based on the same excerpt, is that TASER thought so highly of the fact that these individuals presented the possibility of death that the last section dealt with, basically, for lack of a better term, a protocol on how law enforcement should deal with these deaths and trying to capture evidence. Now, this is what these officers who were certified utilizing version 14 would have known prior to January the 4th, 2013. Counsel, this is obviously a tragedy, but what, even if you are able to say that there's some evidence of deliberate indifference, how can you survive the summary judgment because of the causation? You want to push the envelope? Okay. But I understand that you feel that there was evidence of deliberate indifference, and I understand that. But we have to follow the law, and you know that, and so I'm just trying to figure it out. Your Honor, in my brief, I refer to the Owens v. Cincinnati case, which was a case that outlined the premise that in a wrongful death matter that there are some cases where the particular occurrence is not readily obvious to the party, so in essence, you'd need medical expertise in reference to the approximate cause. But then, there are other situations where it is so obvious that even a layman would appreciate the fact that the individual needed medical assistance, thus negating the requirement of the expert causation. Yes, your question about the TASER cautions and trainings about its utility, in particular, with regard to subjects who present in circumstances that would likely put one on notice that they are likely on drugs, they're high on something, perhaps alcohol, but more likely something else. Now, he's a young man, he's obviously in bizarre behavior, and it's possible that he's having some kind of a mental problem, a stroke or something, but the likelihood is that he's high on something, and the officers themselves comment, what is he high on, you know, but he's also physically very strong, so in those circumstances, what, if anything, does the TASER guidelines instruct with regard to the risk of these repeated uses of TASER? Well, obviously, there's a- Is there more sensitivity to it if you're high on drugs, or what? I think what the TASER's position is, is that these individuals, and I think this is really interesting, is that it's the TASER's position that these individuals are displaying signs or symptoms that would indicate that they're already, basically, under the influence of something. And as a result of being under the influence, if anything, the TASER may aggravate the process, but the bottom line is that these individuals need to be presented with an opportunity for medical assistance. And, Your Honor, when you start thinking about the universe of individuals that our law enforcement agencies deal with, this is a given universe. They will come in contact with individuals that may be on alcohol. They will come in contact with individuals that are on drugs. It would be a non-infrequent occurrence for a police officer on the street to find somebody that's had too much to drink or had high on drugs. My concern, my question is that, and I don't know the answer to that, is what, if anything, the record shows, and you have a lot of information in the record with regard to TASERs as to the use of these electrical impulses in subjects that are intoxicated or are on the use of drugs. As to the susceptibility to it, the risk, et cetera. And I don't know what that is. Obviously, I was speaking from the TASER point of view. If I had on a TASER hat, I think there's really only two lines of reasoning from TASER in a national. One is, the TASER didn't kill him, but the drugs did. So, and I think there's a debate. The question is whether or not the use of TASER in these circumstances was so far beyond the pale as to rise to the level of, to support a fact question as to deliberate indifference. I think that's something pretty close to it. And you want to, the deliberate indifference basically is embedded in the fact that they knew, based on the presentation of Mr. Slade, based on the section that I made reference to in the training, that this individual was at a high risk for some type of adverse effect that relates to dying. Now, the irony of it is, is that when you read Farmer and Brennan, in detail, you really realize that all that needed to be done to alleviate this particular issue was just make a call. I mean, it's so minute. You know, just make an effort. Just call EMS. And even when they get there, he's dead, or, you know, we wouldn't even be standing here. My issue on the deliberate indifference is, is that they made no effort at all, and it was clear, moving from the TASER training. Your argument is it should have been a medical, not a police response. Right. Once he was restrained, and all the TASER policy is, restraint first, medical next. When do you think they had him under restraint? They had him under restraint when they had him handcuffed on the ground that's shown on the video of Officer Roach. And they were going through the procedure of pulling out the TASER bar. He was clearly under restraint at that point in time, and handcuffed. What does the record show with regard to the cause of death? Now, the cause of death in the record is PCP intoxication. But, Your Honor, the state's expert, and this is basically PCP intoxication, which basically meant that there is some lethal level of PCP in the system. But the expert for the city, Ms. Stacey Hill, who's board certified in emergency medicine and a toxicologist, on page 1525 through 1526 states, it's well known in the toxicology community that there are no defined lethal levels for drugs. So, in essence, there's a conflict between the pathologist's report and the allegations of PCP, and this board certified toxicologist, the expert witness for the city, is basically saying that there's no lethal limit. But to answer your question, PCP intoxication. Similarly, there is an excerpt that, I think my time is expiring. You've saved time for about a week. Okay, thank you. Good morning. May it please the court. My name is Darren Coleman, and I represent the city of Marshall Defendants in this civil action. The plaintiff's two appeal points or issues pertain to the denial claim under the 14th Amendment, alleged denial of medical care. The plaintiffs did not appeal the dismissal of any of their other claims, including the excessive force claim or any policy claims that were also dismissed. Before I address the two issues, if I could just very briefly address what I think are some important background facts. First, the events that occurred on Scoggins Street that January 4, 2013, I believe are very well briefed in our brief. There is also videotape evidence that reflects some, not all, but some of what transpired that evening. Where did this happen? I'm sorry? Where in Marshall did this happen? This happened, Your Honor, on Scoggins Street, which is approximately, in relation to downtown, if you were to drive about a two to three minute drive from downtown, from the courthouse square. The other background point that I would like to emphasize is the testimony, well first, the 14th Amendment claims asserted by the plaintiffs have only been asserted against Lieutenant Johnson and Officer Stacy Roach. The other officers were not made a part of that claim. The testimony of Lieutenant Johnson and Officer Roach, as well as every other officer present as they arrived at this scene, was that they did not observe Mr. Slade to be in any type of medical distress. They certainly have testified that he was highly agitated and was possibly high or intoxicated on some type of substance. But most importantly, what they did not observe is any type of medical distress such as unconsciousness, seizing, bleeding, labored breathing, anything like that was absent at the scene of the arrest. The drive from the scene of the arrest to the Harrison County jail facility is only, I think, was undisputed about three minutes. The officers have testified that had they observed any type of medical distress, they certainly would have summoned EMS to the scene. What also was very important is in the discovery phase of this lawsuit, the plaintiffs retained two expert witnesses, a law enforcement expert. He was transported by an EMS vehicle or by a police vehicle? By a police vehicle. And he was in the back seat of the police car? That's correct. And on arrival, he was deceased? No, Your Honor. On the way to the jail, the testimony from the officer who transported Mr. Slade was that he continued to be agitated, to yell in the back seat of the car. When they arrived at the Harrison County jail, there was a second police officer following. Harrison County jail personnel came out, removed Mr. Slade from the back seat of the car and placed him in a restraint chair. That is when he became unresponsive. But he, okay, but he was obviously in an extremist by the time he got there. You said he helped him out of the car? I believe the jailers actually picked him up, got him out of the car, put him in the chair. And the testimony of Officer Corey Atkinson, who was the transporting officer, was that he continued to be agitated and upset in the back seat of the car. The two experts that the plaintiffs retained, the law enforcement expert was a Mr. Grafton and his testimony was that there were no obvious medical issues. How much time lapse was it after he arrived there? Somebody make a decision at that point to transport him to the, I guess, what was the decision made to transport him to the medical? When Mr. Slade was removed from the car and placed in a restraint chair and went unresponsive, they immediately unhandcuffed him, laid him on the floor, summoned EMS and began CPR. And unfortunately, he did not survive and was pronounced dead at the Harrison County jail. The law enforcement expert also stated this, that the officers did not recognize that this was a medical event. I say that because this court, in an unpublished opinion, Batiste v. Thoreau, which is cited in our brief, delves into that issue. If the officers didn't recognize it, then they could not have had subjective awareness necessary under the 14th Amendment. But also what's important is the plaintiff's medical expert agreed that the unresponsiveness and the cardiac event did not occur until he arrived at the jail. And that in his opinion, that there was no evidence that any officer was aware of a serious medical condition or that any officer was intentionally denying Mr. Slade that care. So those expert opinions of the plaintiffs became important in the court's analysis. The last fact I want to talk about is the pathology report. And it does indicate that the cause of death was PCP toxicity and that the manner of death was accidental. I do want to address very briefly, Your Honors, questions about Taser and Mr. Huey's comments about that. First, there also was no evidence, although there's no appeal of the excessive force claim, there was absolutely no evidence presented to the District Court that the use of a Taser caused or contributed to Mr. Slade's untimely death. And that was no mention of such in the pathology report of that. In issue number one, presented by the plaintiffs, the plaintiffs wished to dispose of the Taser. There was no other evidence in the record, medical evidence in the record about his causal relationship of the drugs and the Tasers to his death. Your Honor, we, let me. Well, we know facts. Lee was Tasered and those facts. We know that he, there's evidence here of the record that he was intoxicated, TCP, and we know he died. Um, I don't know if, and we have an examiner's report that says intoxication. So I didn't know if there was anything else, any other medical evidence surrounding this. Your Honor, our, our, our, uh, that's, that's pretty much it. Your Honor, our, our retained medical expert mentioned by Mr. Huey, Dr. Stacy Hale testified about the effects of PCP upon a person. And the comment that Mr. Huey was referring to is PCP toxicity can affect almost everyone differently depending on a lot of factors. And so it's not the level of PCP toxicity necessarily that, that causes or produces a death. Uh, but in this case, it produced a cardiac event, uh, a systole, uh, for which he, he passed. Now, I know that your position is that they would have to know that he was having this excited delirium. Is there evidence in the record that a reasonable person, reasonable officer would know? I, I, I know that that's not the test. But I'm asking, is there any evidence in the record that officers should be aware of this excited delirium syndrome? In the TASER literature, Your Honor, there, there is a reference to the potential for excited delirium. It references, uh, some of the signs and symptoms to look for. But in this case, the officers, uh, did not witness anything that they would describe as a medical event. Um, again, labored breathing, unconsciousness, that sort of thing. And I believe the standard that, uh, the plaintiffs have tried to invoke, uh, in the trial court, um, not, not on this appeal, was that the officers should have known. And should have known, it falls short of a deliberate indifference standard. And it is, it is in fact a negligence standard. The first issue that the plaintiffs addressed is trying to dispose of the element of and the, uh, death of Mr. Slate. And again, they, they make this argument because before the trial court and before this court and, and the plaintiff's briefing, uh, the plaintiffs have conceded that they have no evidence that the alleged failure to summon EMS to the scene caused or contributed to Mr. Slate's death. There is no evidence of that. So even if the officer should have known, and there is evidence in the record of that, even if should have known was the standard instead of deliberately indifferent, you, is it your position that the claim would fail as a matter of law nonetheless? Nonetheless, Your Honor. It's the proximate cause issue, and I'll, I'll address that in just a moment. Um, I, I would like to say this, that the trial court, when this issue of no proximate cause between, uh, or the causal link between an alleged delay of medical care and the death of Mr. Slate, that really came to light at a pretrial conference, uh, before the trial court. The trial court then allowed, uh, the plaintiffs and their medical expert to basically reopen discovery for that specific issue, um, and to review additional materials. And, uh, even after, uh, quite frankly getting a second bite at the proximate cause apple, uh, the, the plaintiff's medical expert, uh, again, could not opine. Well, my intuitive reaction to, to that point of the lawyer would have been to inquire the, you know, TCP doesn't necessarily end the inquiry because that, that's going to really shut down the electrical system of the heart, and that's the mechanism of the heart failure. And that also could be the, the mechanism of electrical shock as well. In other words, yes, he died of a heart failure, but it wasn't a stroke. It was the, it was the, it was the other half of the heart function, the electrical system, and that, that shuts you down. Your Honor. TCP would do that, but then my question was, okay, uh, Taser, the electrical impulses might do that too, but there's not, uh, I'll be clear, as I understand this record, there's nothing that says that, that's right. No, Your Honor, and I, I would say this, that, that, that very issue, uh, Taser International was made an initial defendant in this case as well. That was the allegation being made against Taser. There is, there is abundant literature that was, uh, conducted during the discovery that, uh, there is no evidence that the use of a Taser, uh, would cause this type of, in fact, the use of a Taser has a minimal amount. Independently or in conjunction with a, with a, with already a dilated heart mechanism. There have, I, I was actually very surprised at the number of studies, uh, that have been The Taser, the plaintiffs voluntarily, um, dismissed Taser International after a reasonable discovery period and could not prove that, that, that element. Um, and, and also, Your Honor, there was no evidence on the excessive force claim. It's not made apart. There was no evidence that the use of the Taser caused or contributed to the death as well, and it was lacking. Um, as far as the, the issue of disposing of the element of proximate cause, um, this is a part of a 1983, uh, cause of action, uh, long history of cases. It's included in this court's, uh, uh, pattern jury instructions. But also, that would be my first argument. The second argument of why it's necessary is, is this court in, in the opinion of Phillips versus Monroe, uh, and this is very key, stated, a plaintiff seeking to recover on a wrongful death claim under 1983 must prove both the alleged constitutional deprivation and the constitutional acts and omissions and the death, and here's the important part, under the state's wrongful death statute, the forum state's wrongful death statute. Of course, uh, uh, 1988 directs, uh, litigants in the courts, uh, in, in a 1983 action to look to the forum state's laws to, uh, fill the gaps, so to speak, in the administration of a 1983 cause of action. So, um, in this case, the, the trial court, uh, and the plaintiffs were using the Texas Wrongful Death Act, uh, and in that act, the, the, it specifically states that liability may only be found when an injury causes the death. And so, plaintiffs have conceded to the trial court that there was no evidence of that causation and the court, uh, relying on Phillips versus Monroe, uh, granted summary judgment. The court also talked about, and rightfully so, uh, Texas common law as it pertains to the use of whether medical testimony is needed, uh, or not, and in Texas, to establish a causal link between some event and, uh, injury or death, uh, medical testimony is, is almost always required except in those very few cases in which, uh, the answer would lie in a lay person's general knowledge. Expert testimony would not be needed. Here, we're talking about the plaintiff's allegation of an alleged delay or denial of medical care to a death. Very complicated issue, so complicated that even the plaintiff's expert, uh, twice being given the opportunity could not do that. So, it's clearly outside a lay person's knowledge. Uh, before moving to the, to the second issue, I want to address the, the, the opinion that plaintiff's counsel raised in his briefing here this morning, and that's the Owens v. opinion, which is a Sixth Circuit opinion. Um, I think in, in an unpublished opinion in 2012, this court expressly rejected, uh, the Owens v. rationale, which is, uh, that there was, that, that the element of, uh, in determining whether a death occurred in a 1983 cause of action. I, I submit this to the court. I, I, I really struggled with that opinion in, in trying to understand it. So, I, I would urge the court in, in looking at Owens v., it's just a little blurb in Owens v., but they rely on a case called Blackmore v. Kalamazoo County. And when you read that case, that is a case where, uh, it's a Fourteenth Amendment denial of medical care, but it's a case where the Sixth Circuit, uh, where a gentleman was in jail, got appendicitis, complained of pain for two days, finally got to the hospital, had an appendectomy, had a great recovery, no ill effects. And so the question there before the Sixth Circuit in Blackmore was, is expert testimony or is proximate cause required in determining in cases where, and they found that in that case, the Blackmore case, that the inmate's complaints of side pain and all this were obvious, and he was obviously in pain. In those circumstances, the Sixth Circuit said, you, you don't have to show proximate cause because it's so obvious. But in cases where perhaps a person is in jail or incarcerated and the injury is minor and then manifests into something greater, then they said, yeah, there, you, you probably will need expert testimony. But here, here's the point, and here, here's where I, my conclusion on how Owens v. got to where it got. In Blackmore, that whole causation analysis about, you know, do you need expert testimony and do you need proximate cause, they're actually analyzing the actions of the officers to determine whether or not there was a constitutional violation. And then the Owens v. Court came and they went a little further. They took, they removed the proximate cause element from, okay, did the, did the constitutional violation cause damages? In that case, they were trying to argue, did the constitutional violation cause the death in Owens v. So in my opinion, I respectfully submit that they went a little too far and quite frankly misinterpreted the underlying premise in Blackmore. That's the only explanation that I have. It happens, remind me about the record when people are arrested and they, and they've been, and they've obviously been under the throes of a, of a drug-induced state. And do they check their vitals or anything when they're putting them in after they get them subdued or, is that, that's nothing, nothing like that happens as a matter of course. It's a matter of course. It's a matter, quite frankly, of, of just, you know, observation, common sense. Police officers, you know, summon medical assistance if, if there's a medical need. They arrest, you know. But they're not proactively checking to see if there's a medical need. Generally not. It's usually if it's something obvious like, are they having difficulty breathing? Is there, is there blood present? You know, are they unconscious? The things that, that, you know, and I think the case law is very clear. Police officers are not trained EMS personnel. But, you know, they, they do use their observation skills. Um, and, and of course the, the record is every, every day, you know, uh, law enforcement arrests people who are, are, are high and intoxicated and extremely violent. Uh, and, and they go to jail unless they're experiencing some type of medical, uh, issue. And of course when they go to jail, they're monitored as well there, uh, under those circumstances. Last, I want to jump to the second issue, and that is where, uh, the plaintiffs are, are, uh, asking the court to adopt the lost chance of survival doctrine again because they cannot prove proximate cause. Um, 1988 directs us back to the state court's, uh, forum law, uh, as to, to, to fill in these gaps. In 1993, the opinion on the lost chance pretty well ended the Texas version of that. I'm adopting the lost chance, spoke very clearly about lost chance to the extent that informs the analysis. 1980, uh, in 1993, Kramer versus, uh, Louisville Memorial Hospital, Texas Supreme Court expressly rejected the lost chance doctrine based upon the language of the Texas Wrongful Death Act, which says it must cause, not cause a loss of chance, but cause death. The second point, and in closing here, the, the court, excuse me, the plaintiffs asked the court to rely on Robertson v. Wegman, which is a Supreme Court decision. Um, the issue there was, uh, uh, Louisiana court, uh, trial court, and the, the issue was whether, uh, or not the, the court was required to follow the state's survival or wrongful death, uh, action or whether they're free to create some type of federal common law remedy if that would potentially end the case for the plaintiff. And the Supreme Court, uh, said that, that, uh, looking at 1988, uh, that the Louisiana, uh, survival statute plainly governed the case, and the fact that it ended the case for the plaintiff, uh, is of no consequence. In fact, the, the, the inconsistency rule that, that a court would look at under 1988, it does not include whether one party is advantaged over another under the state's wrongful death statute. In this case, uh, the fact that, uh, the state of Texas has chosen not to adopt the loss of chance of survival doctrine does not undermine the two purposes of 1983, which is to compensate individuals who have been injured by constitutional violations, and number two, to prevent abuse of power. Neither one of those policies of 1983 are undermined in any way by the Texas doctrine. Thank you, counsel, for your argument. May I please report? First thing I want to address is, uh, what the officer said that they saw. They indicated that they didn't deal with this because he wasn't laboring, no bleeding, he wasn't unconscious, no seizures, and, uh, and that he didn't have any cardiac arrest. But that's not what they were trained on. They were trained on the Taser warning that said extreme aggravation, bizarre behavior, inappropriate nudity, impertinence to our pain. That's what they were trained on. So when they saw this individual, they knew that he fit what Taser had put as a descriptive me, because they didn't intend for law enforcement officers to be up over there taking calls and everything. When you see this elephant, it's an elephant. Let's put that to rest. Batiste. Were you saying that the Tasering was excessive force, or that after they Tasered him, they should have immediately called EMS, or? They should have immediately called EMS, and that's what Taser says. And, uh, one excerpt that's, uh, under tab, uh, eight, is from the guru of Taser, uh, Mr. Michael Braid. Look at that excerpt. He indicates that it's a medical emergency. So I'm actually standing here arguing that the Taser warnings told them what to do. And when you look at the video, you realize that they realized that it told them what to do. And if you look under a additional tab in here that, I guess, is tab seven, you will see a report from a marshal officer that came in contact with an individual that he wasn't disrobed, but was acting bizarre, that he Tased, found out that he was on wet. He took him to the emergency room. So they knew it. So what about Batiste? Batiste was an individual that basically had sickle cell anemia. There's no way in the world an officer would have known an individual had sickle cell. It's a mutation in the cell of individuals from Africa that has been formed for the dealing with malaria. So, yes, that would not have been obvious. And that goes back to the fact of Owensby. The concept is, was it obvious? There's enough in the news media dealing with Taser deaths and individuals passing. Matter of fact, there was just something a couple of weeks ago where they actually had the individual at the hospital and he got the Liprin. They Tased him and instead of taking him into the hospital, they took him back to the jail where he died. So in America, an individual that's nude, in freezing temperature, acting bizarre, supernatural strength, and even the officers are chiming in, and there's an individual on the site that says, after the officer goes through a triage, has he been this way before? That says, yes, he has. Take him to the hospital. They got medicine for him. And those of you that may not know Marshall, the issue came up on the location. Well, the location on Skagen is less than five minutes from the major fire station and less than five minutes for the sub fire station. We're talking about a series of more than less than two or three left and rights for a paramedic to have gotten there. Now, if you go from the time they put him in the car, it was five minutes. They could have called. When they were out there looking for the contrast before they basically made a decision to move him, what they were going to make. Because one of the officers obviously knew because he asked the question, where should we take him? To the hospital or to the jail? And even when the other officer said to the jail, he said, do you think they would take him like that? And the same officer Roach, as he walks into the salary port when this man is dying, comes in boasting on that wet marijuana laced with PCP. He knew what this kid had. When he got to the scene, he asked, have you been smoking, Marcus Slade? Because you smoke wet. No, they're training an individual standing that would have known going with Osby that this guy, Marcus Slade, should have been taken, at least observed by a medical source. And my expert witness said it would have taken two minutes to run the vitals. Two minutes. No. Thank you. Thank you. Thank you both for excellent arguments.